ACCEPTED
03-15-00429-CV
7179551
THIRD COURT OF APPEALS
AUSTIN, TEXAS
10/1/2015 9:33:36 AM
JEFFREY D. KYLE
CLERK

No. 03-15-00429-CV

IN THE THIRD COURT OF APPEALS

AUSTIN, TEXAS

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
10/1/2015 9:33:36 AM
JEFFREY D. KYLE
Clerk

Dennis Draper, Greg Hadley, and Charles Huston,

Appellants,

v.

Austin Manufacturing Services, I, Inc.,

Appellee.

On Appeal from No. D-1-GN-09-004416, in the 353rd Judicial District Court, Travis County
Honorable Orlinda Naranjo, Presiding

## BRIEF OF APPELLANTS DENNIS DRAPER, GREG HADLEY, AND CHARLES HUSTON

LAW OFFICE OF MICHAEL S. TRUESDALE, PLLC
Michael S. Truesdale
State Bar No. 00791825
801 West Avenue, Suite 201
Austin, TX 78701
512-482-8671
866-847-8719 (fax)
mike@truesdalelaw.com
COUNSEL FOR APPELLANTS
DRAPER, HADLEY, and HUSTON

ORAL ARGUMENT REQUESTED

# IDENTITY OF PARTIES AND COUNSEL

| | |
|---|---|
| Appellants (defendants below) | Dennis Draper, Greg Hadley, Charles Huston |
| Appellant's Trial Counsel | THE O'TOOLE LAW FIRM, PC<br>Brian O'Toole<br>botoole@botoolepc.com<br>504 Lavaca, Suite 945<br>Austin, TX 78701<br>512-476-4740 |
| Appellant's Appellate Counsel | LAW OFFICE OF MICHAEL S. TRUESDALE, PLLC<br>Michael S. Truesdale<br>mike@truesdalelaw.com<br>801 West Avenue, Suite 201<br>Austin, TX 78701<br>512-482-8671<br>866-847-8719 (fax) |
| Appellee (plaintiff below) | Austin Manufacturing Services I, Inc. |
| Appellee's Counsel | Brian A. Colao (trial)<br>bcolao@dykema.com<br>Christopher D. Kratovil (appeal)<br>ckratovil@dykema.com<br>Dykema Gossettt PLLC<br>1717 Main Street, Suite 4000<br>Dallas, TX 75201<br>214-462-6400<br>214-462-6401 (fax) |

Other parties to the trial court's final judgment include Darryl Cornish, Assistant Pro, Inc., and TQI Corporation. These entities did not appeal. They were represented in the trial court by The Law Office of Shane M. Boasberg, Shane M. Boasberg (shaneb@law-smb.com), 2901 Bee Caves Road, Box E, 78746, 512-561-5003, 512-561-5004 (fax)

i

# TABLE OF CONTENTS

IDENTITY OF PARTIES AND COUNSEL ........................................................... i

TABLE OF CONTENTS ................................................................................... ii

INDEX OF AUTHORITIES ............................................................................ iv

STATEMENT OF THE CASE ...........................................................................v

STATEMENT REGARDING ORAL ARGUMENT .................................................v

ISSUES PRESENTED ................................................................................... vi

STATEMENT OF FACTS ..................................................................................3

A.    The "Golf Guru" device .......................................................................3

B.    Efforts to manufacture Golf Gurus ......................................................4

    1.    AMS agrees to extend credit to TQI – but not to A-Pro ......................4

        a.  The Purchase Order to be guaranteed .............................................5

        b.  The Guaranty of the Purchase Order ..............................................6

    2.    Efforts to ensure that the PO listed A-Pro as the "purchaser" so it could earn credit .........................................................................7

C.    AMS does not satisfy the terms of PO 1682, ultimately changes its price, quantity, delivery date, and the products to be covered .......................8

D.    Cornish brings in a new investor who diluted the Individuals' interests ........8

E.    A-Pro initiates its own orders with AMS .........................................................9

F.    Cornish sells all Golf Guru units and decides what to do with the sales proceeds .................................................................................................10

G.    AMS realizes the Guaranty did not cover transactions under PO 1682 but names the Guarantors with other defendants anyway .............................11

    1.    Trial evidence shows a zero balance was due under PO 1682 ...........11

    2.    The trial court's judgment ...............................................................13

SUMMARY OF ARGUMENT ...........................................................................14

ARGUMENTS AND AUTHORITIES ..................................................................16

I.    The judgment against the Individuals constitutes error given the terms of the Guaranty and the evidence in the record .........................................16

A.    Standard of review ............................................................................17

B.    The record demonstrates why the Individuals cannot be liable under the Guaranty ......................................................................................18

    1.    AMS failed to establish the existence of a transaction that would invoke the terms of the Guaranty .........................................19

a. AMS did not extend credit to A-Pro as contemplated by the Guaranty ................................................................................19

b. A-Pro was not a party to PO 1682 ..........................................20

c. AMS failed to establish an underlying breach of contract by A-Pro .................................................................................21

2. Any obligations that could have ever existed under the Guaranty were eliminated by the multiple material alterations of any transaction described in the Guaranty .........................................23

3. The evidence established that no amounts were due under PO 1682 ...................................................................................................25

a. Testimony from AMS's own controller confirms what AMS's exhibits show – that nothing remained due under PO 1682 .................................................................................25

b. AMS's "sworn account" exhibits and testimony from other witnesses confirm that nothing remained due and owing under PO 1682 ...............................................................26

c. The record confirmed that invoices particular to PO 1682 were not in fact aging so as to give rise to a claim under the Guaranty ...........................................................................29

d. Every other exhibit cited by AMS in its motion for entry of judgment confirms that nothing remained due and owing under PO 1682 ...............................................................30

e. AMS cannot classify the PO as a "blanket" PO in order to pigeonhole later obligations as arising under PO 1682 and thus subject to the Guaranty ..............................................31

4. The Guaranty was limited to "amounts due" under PO 1682 .............33

C. The award of attorney's fees constitutes error ...............................................34

PRAYER FOR RELIEF .....................................................................................36

CERTIFICATE OF SERVICE ...........................................................................37

CERTIFICATE OF COMPLIANCE ..................................................................38

APPENDIX .........................................................................................................TAB

# INDEX OF AUTHORITIES

## Cases

*City of Keller v. Wilson*,
    168 S.W.3d 802 (Tex. 2005)..............................................................................18

*Cox v. Lerman*,
    949 S.W.2d 527 (Tex. App. — Houston [14[th] Dist.] 1997, no writ).............20

*Fourticq v. Fireman's Fund Ins. Co.*,
    679 S.W.2d 562 (Tex. App.—Dallas 1984, no writ) ...................................23

*Material Partnership v. Ventura*,
    102 S.W.3d 252 (Tex. App.—Houston [14[th] Dist.] 2003, pet. denied)...20, 22

*McKnight v. Virginia Mirror Co., Inc.*,
    464 S.W.2d 428 (Tex. 1971).......................................................13, 14, 19, 23

*Moore v. White Motor Credit Corp.*,
    708 S.W.2d 465 (Tex. App.—Dallas 1985, writ ref'd n.r.e.) .......................20

*Mustang Pipeline Co. v. Drier Pipeline Co.*,
    134 S.W.3d 195 (Tex. 2004)..............................................................................21

*OAIC Commercial Assets v. Stonegate Village*,
    234 S.W.3d 726 (Tex. App. — Dallas 2007, pet. denied) ...........................21

*Pham v. Mongiello*,
    58 S.W.3d 284 (Tex. App. — Austin 2001, pet. denied)..............................19

*Republic Nat'l Bank v. Northwest Nat'l Bank*,
    578 S.W.2d 109 (Tex. 1978)..............................................................................21

*Tony Gullo Motors v. Chapa*,
    212 S.W.3d 299 (Tex. 2007)..............................................................................35

*United Concrete Pipe Corp. v. Spin-Line Co.*,
    430 S.W.2d 360 (Tex. 1968)..............................................................................23

*Vastine v. Bank of Dallas*,
    808 S.W.2d 463 (Tex.1991)..........................................................................13, 24

## STATEMENT OF THE CASE

This is a suit for a breach of contract and to enforce a commercial guaranty. Austin Manufacturing Services, I, Inc. (AMS) sued Assistant Pro, Inc. (A-Pro), TQI Corporation (TQI), and Daryl Cornish for amounts it alleged to be due under an account. AMS also sued Dennis Draper, Greg Hadley and Charles Huston (referred to as the "Individuals") asserting a claim on a guaranty against a default by A-Pro of payments for any amounts due under a particular purchase order. *See generally* CR 4-14. After a bench trial, the trial court, Honorable Orlinda Naranjo, rendered judgment in favor of AMS and against A-Pro, TQI, and Cornish, and against the Individuals. CR 492. The judgment awarded $475,800 in damages, $150,000 in trial court attorney's fees, and up to $45,000 in conditional appellate attorney's fees. CR 494. The Individuals were each adjudged liable on a guaranty for 25% of the amount of damages awarded ($87,586.21 each), and were each adjudged jointly and severally liable for the award of attorneys' fees. CR 495-96. The Individuals appealed the judgment holding them liable for a portion of debts owed by A-Pro and TQI, but Cornish did not appeal the judgment against him or against TQI and A-Pro, the companies he owned and whose liability would be reduced by up to 75% were the Individuals found liable under the Guaranty.

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to Tex. R. App. P. 38.1(e), Appellants submit that oral argument will assist this Court with the resolution of this appeal. Oral argument will provide

an opportunity to address questions regarding the Guaranty, and the various

reasons why liability thereunder was never triggered.

## ISSUES PRESENTED

1.    The trial court erred in rendering judgment against the Individuals:

  – The record conclusively established that the transaction
    contemplated by the Guaranty – a contract between AMS and A-
    Pro whereby AMS would extend A-Pro credit and A-Pro would be
    a purchaser – did not occur, such that there was no transaction to
    guarantee

  – Assuming a transaction arose subject to the Guaranty, the essential
    terms of the purchase order giving rise to the Guaranty were
    modified without notice to or the consent of the Individuals,
    invalidating as a matter of law any obligation that may have
    otherwise arisen under any Guaranty

  – The record conclusively established that no amounts were in
    default by A-Pro under the purchase order referenced by the
    Guaranty, and instead, any amounts due arose from other purchase
    orders not subject to the Guaranty, such that, as a matter of law, the
    Individuals cannot be liable under the Guaranty

2.    The trial court erred in rendering judgment awarding attorney's fees
      because AMS did not segregate the fees awarded in its favor.

TO THE HONORABLE COURT OF APPEALS:

Appellants Dennis Draper, Greg Hadley, and Charles Huston (the Individuals) file this Brief of Appellants, complaining of the final judgment in favor of Austin Manufacturing Services, I, Inc., and in support state as follows:

The judgment holds the Individuals liable under a personal guaranty (the Guaranty).[1] By the Guaranty, each Individual purportedly guaranteed twenty-five percent of any amounts due to AMS under a specific purchase order (PO 1682) for the purchase of 5,000 units of product on which A-Pro, as the "Purchaser", defaulted. *See* 6RR 27-30 (Guaranty); 6RR 25 (PO 1682)). This appeal is <u>not</u> about whether A-Pro or any other entity defaulted on obligations to AMS under <u>other purchase orders</u>. It simply challenges whether the judgment against the <u>Individuals</u> could properly arise given the terms of the Guaranty and the evidence surrounding any transactions purportedly invoking the Guaranty. The judgment against them constitutes error for at least three reasons.

First, the Guaranty presupposes a contract between AMS and A-Pro whereby AMS would extend credit to A-Pro, and A-Pro would be a "Purchaser", under a designated purchase order – PO 1682. 6RR 27. But no such transaction occurred with the parties so configured. AMS refused to contract with A-Pro, declined to accept a purchase order from A-Pro, and instead only contracted with

---

[1] Each of the Individuals executed the same form personal guaranty, *see* 6RR 27-30, and that form is referred to herein simply as "the Guaranty".

1

the separate entity TQI Corporation (TQI) that was in fact named as the "Purchaser" on the PO identified in the Guaranty. In the absence of an underlying contract between AMS and A-Pro as described in the Guaranty, no liability could even arise under the Guaranty.

Second, even had A-Pro entered into a contract with AMS when the Guaranty was executed (which the record shows it did not), the terms of any guaranteed agreement were fundamentally altered without notice to, and without the consent of, the Individuals. Instead, Darryl Cornish (through Rick Horne, an employee of the "Purchaser" TQI) directed AMS to alter the PO, changing the delivery date, the quantity, and the pricing structure, and directing AMS to produce a new line of products beyond what had been at issue under the Guaranty when it was executed. Those changes made it impossible to sell the units described in the Guaranty before the Christmas season, sales which would have eliminated any liability that could have ever arisen under the Guaranty. And while AMS's sworn account claim references a series of other purchase orders entered into between AMS and A-Pro at a later time, those transactions are not referenced by, or subject to the terms of, the Guaranty and cannot justify a judgment against the Individuals.

Finally, and most importantly, the Guaranty only governed amounts "in default" by A-Pro to the extent it was the "purchaser" under "PO 1682". The evidence at trial demonstrated that no amounts remained due under PO 1682, and

2

accordingly, there was no default by A-Pro (or, for that matter, anyone else) of obligations under that PO to trigger any obligation under the Guaranty. Whether amounts remained due to AMS from TQI or A-Pro under <u>other</u> purchase orders entered into on <u>later</u> dates is immaterial to whether the Individuals can be held liability under the Guaranty. AMS's remedy for any such amounts would be against TQI or A-Pro or the owners of those entities, but the Guaranty does not give recourse against the Individuals for those debts that they never guaranteed.

## STATEMENT OF FACTS

### A. The "Golf Guru" device

In 2006, Dennis Draper, Greg Hadley, Charles Huston, and Darryl Cornish, shareholders of Assistant Pro, Inc. (A-Pro), began efforts to manufacture a product called the "Golf Guru," a hand-held GPS unit to assist golfers. Cornish was also the sole owner of a separate entity called TQI Corporation (TQI),[2] which contracted with A-Pro to develop its products, build a website, and work on sales and marketing. 3RR 158-59; 3RR 11.[3] Cornish and TQI employee Rick Horne started talks with Austin Manufacturing Services, Inc. (AMS), a company Cornish used in the past on other projects, about building the Golf Gurus. *See* 2RR 78.

---

[2] Through the operative time periods (2007-2008) Cornish was the only person affiliated both with TQI and A-Pro, 3RR 36, as he was also a partial owner and/or shareholder of A-Pro. 3RR 107.

[3] The Reporter's Record contains an amended Volume 3, and citations herein to "3RR __" are to the amended volume.

3

**B.    Efforts to manufacture Golf Gurus**

Cornish indicated to AMS he was working with a new venture, A-Pro, and that A-Pro wanted to establish credit and have AMS build its devices.  2RR 26. AMS would not extend credit to A-Pro because A-Pro was a new entity with no credit history, *see* 2RR 79; 6RR 440.  But AMS indicated it would consider granting credit to TQI if TQI and A-Pro committed to be fully liable and if the principals of A-Pro gave personal guarantees.  2RR 26; 2RR 70. As part of the discussions with AMS, Cornish and Horne sought bids on various quantities of black and white display (grayscale) units, and on September 24, 2007, AMS presented a bid.  *See id*; *see also* 6RR 115-120 (Ex. 104).

**1.    AMS agrees to extend credit to TQI – but not to A-Pro**

Originally, the proposal raised by Cornish assumed that A-Pro would issue a 5,000 piece purchase order to AMS.  But that turned out not to be an option because of AMS's concerns over A-Pro's lack of credit history.  The original PO sent from A-Pro to AMS was rejected because of A-Pro's lack of a credit history. 3RR 39.  AMS declined to extend credit to A-Pro, did not enter into a contract with A-Pro, and rejected A-Pro's proposed purchase order.  3RR 38.  Cornish proposed an alternative plan whereby the Individuals would guarantee obligations of TQI, but the Individuals made it perfectly clear they would only guarantee a purchase order for A-Pro, and never for TQI.  4RR 61.

At no time did AMS agree to provide any units directly to A-Pro in connection with this initial transaction, and in connection with the Guaranty, AMS never approved any purchase order directing any shipments to be made directly to A-Pro. Instead, AMS accepted a purchase order from TQI that tracked the terms of AMS's bid both in terms of price and quantity but that named TQI as the contracting party. 6RR 26 (Exhibit 1) (PO 1682). But as noted, the Individuals did not agree to guarantee a debt of TQI, only a debt of the entity to which they were shareholders – A-Pro. 4RR 62.

With that understanding in mind, Huston reviewed the draft of the personal guaranty proposed by AMS, changing its reference to a guaranty from "all amounts" to only those due under any specified purchase order, and ensuring its reference to amounts in default by "A-Pro" to the extent it was denominated as a purchaser under the purchase order to be referenced by the Guaranty. 6RR 646-47. Once Horne circulated a purchase order number to be inserted in the Guaranty, the Individuals signed the Guaranty.

### a. The Purchase Order to be guaranteed

PO 1682, dated October 7, 2007, referenced the bid number for AMS's earlier quote, and tracked the quoted pricing and quantities for the product number contained in that bid (*i.e.*, product number TC21301 for a grayscale Golf Guru unit). 6RR 26; *compare with* 6 RR 668 (Sept. 24, 2007 quotation). The PO

provided that the units were to be shipped to "TQI Systems" (not to A-Pro[4]), with an expected delivery date of November 23, 2007. *Id.* That date was important because it would have allowed for the marketing and sale of the units prior to the holiday season. *See* 3RR 69. In fact, Greg Hadley confirmed that if all the products would have been delivered on that schedule, they would have sold out. 4RR 25-26; *see also* 3RR 43 (noting importance of the November delivery deadline).

### b. The Guaranty of the Purchase Order

By its terms, the Guaranty was given in consideration for the extension of credit to A-Pro, the entity defined as the "Purchaser". Specifically, the Guaranty read:

> I [name of guarantor] for and in consideration of your *extending credit at my request to Assistant Pro, Inc.*, a Texas Corporation (hereinafter referred to as the "Purchaser"), of which I am a shareholder, personally guarantee to you the payment of twenty-five percent (25%) all amounts due to [AMS] under Purchase Order 1682 for the purchase of 5000 Golf Guru units (hereinafter "Guaranteed Portion.").

---

[4] The trial court made a finding of fact that TQI and A-Pro were "sister companies." The record does not support such a finding. Even Darryl Cornish testified that TQI simply had a management contract with A-Pro. *See* 3 RR 159. The two entities had separate tax identification numbers and different telephone numbers among other things. 3RR 37. A-Pro did not share an office with TQI, operated remotely from TQI, and nobody from A-Pro was in the office of TQI. 3 RR 15. Similarly, Horne testified A-Pro and TQI were not the same company, and that TQI and A-Pro were simply operating under a management contract, whereby TQI would provide marketing, production and development of the products that ended up in the stream of commerce to A-Pro. 3RR 35; *see also* 3RR 56 (the companies were not the same; TQI just had a contract with A-Pro that authorized it to negotiate with AMS); 3RR 100 (no A-Pro employees officed at TQI and A-Pro maintained a different address).

6

I hereby agree to *pay such Guaranteed Portion* punctually *if default in payment* thereof *is made by the Purchaser*.

6RR 27-30 (emphasis added). Thus, by its terms, the consideration exchanged for the Guaranty was to be the provision of credit <u>from AMS to A-Pro</u>, while the commitment given by the Individuals was to pay amounts due <u>from A-Pro to AMS</u> under PO 1682 if A-Pro defaulted on those payments for which credit had been extended to it (consistent with the willingness of the Individuals to guarantee debts of A-Pro, not TQI). *Id.* And, as liability was limited to a default by A-Pro on amounts due to AMS under PO 1682, the Guaranty was limited to defaults on A-Pro's part on amounts due from A-Pro to AMS for 5,000 grayscale Golf Guru units to be delivered by November 23, 2007.

### 2. Efforts to ensure that the PO listed A-Pro as the "purchaser" so it could earn credit

When Huston saw that the purchase order referenced in the Guaranty was in TQI's name rather than in A-Pro's, he thought it must be a mistake given the entire point of the guarantee process, specifically because a purchase order in TQI's name would not establish any credit record for A-Pro if it were not the named party to the contract. *See* 4RR 60-61; 6RR 458 (Ex. 25). Thus, Huston asked Horne to confirm whether an error had occurred in that the PO referenced by the Guaranty identified TQI rather than A-Pro as the purchaser. At no point did AMS did amend PO 1682 to name A-Pro as the contracting party rather than TQI.

7

**C.** **AMS does not satisfy the terms of PO 1682, ultimately changes its price, quantity, delivery date, and the products to be covered**

AMS did not deliver 5,000 units to TQI by November 23, 2007. At the direction of Cornish, in January 2008, Horne requested Iain Hurn, his point of contact at AMS, to accept a new, revised PO 1682. That PO was for 1,000 color units at a higher per-unit price, back-dated to October 7, 2007, the same date as the original PO 1682. *See* 3RR 102-03; 6RR 420. But Horne testified that AMS's quotes and bids relating to a purchase order for <u>color</u> units gave rise to a "different PO than the 5,000 units." *Id*. He also noted that subsequent orders of golf guru units were not under PO 1682 – none referenced PO 1682 and all subsequent orders were under different purchase orders. 3RR 104. While AMS's Hurn discussed those changes with Horne, AMS did not discuss them, nor bring them to the attention of, any of the Individuals. *See* 2RR 215-16. In fact, AMS never had any communications with Huston. 4RR 46. And despite Huston's earlier request that A-Pro be named as the purchaser, the modification to PO 1682 resulting from Horne's discussions with Hurn resulted in no such change.

**D.** **Cornish brings in a new investor who diluted the Individuals' interests**

In March 2008, Darryl Cornish brought in a new investor, Tim Alberts, into A-Pro who received preferred stock for his contributions, and who made an investment to pay down debt owed by A-Pro to AMS and to fund, manufacture, and sell a new product. 3RR 54. The effect of that contribution was to effectively

8

dilute the common shares owned by Draper, Hadley and Huston so much as to "wash out" any equity interest they had, leading Huston to resign his position with A-Pro in March 2008. *See* 3RR 174; 4RR 58. Cornish had represented to the Individual Guarantors that their collective liability under the Guaranty had been limited to $20,000 (Ex. 130, 136, 22), and that the Alberts' investment had paid that liability down.

## E.    A-Pro initiates its own orders with AMS

By late 2008 and going into 2009, A-Pro did start issuing its own purchase orders to AMS for golf guru units. *See, e.g.,* 6RR 692-696 (Ex 65-69). But those purchase orders did not purport to relate to, or make any reference to PO 1682. *Id.*; *see also* 3RR 104 (Horne noting that those subsequent orders were under purchase orders separate than PO 1682). After Alberts came in and the Individuals' interests were diluted, in December 2008, A-Pro and AMS entered into PO 1007 for a total of $140,862. 6RR 687 (Ex. 61). And as another example, in March 2009, A-Pro and AMS entered into another PO, this time PO 1019, for $222,243.60. 6RR 694 (Ex. 62). Neither PO 1007 nor PO 1019 referred to PO 1682 or purported in any way to be a "draw down" of products identified under PO 1682.

At trial, AMS claimed that A-Pro was liable for payments due under PO 1007 and asserted amounts due under that PO as being owed by the Individuals under the Guaranty. *See* 6RR 908 (Ex. 81, listing PO 1007 as an invoice for which

9

a balance of $30,679.54 was due).  Similarly, AMS also claimed that A-Pro

defaulted on amounts due under PO 1019.  *See* 6RR 908 (listing PO 1019 as

having a balance due of $142,395.50).  But while AMS's lawsuit claimed amounts

due under both of those specific purchase orders, the exhibits to its lawsuit did not

claim any amount were due from anyone under PO 1682, the one specific purchase

order identified in the Guaranty on which AMS sued the Individuals.  *See id.*

(showing no balance due for that PO).

**F.      Cornish sells all Golf Guru units and decides what to do with the sales
proceeds**

Through 2008 and 2009, AMS delivered approximately 5,300 golf guru

units to TQI in some mix of grayscale and color units.  During that same time,

AMS was paid approximately $830,000 for the units.  3RR 188.   A-Pro sold every

Golf Guru unit delivered to it. 5 RR 38.  But Cornish decided to allocate the money

that came in for the units to other expenses rather than to pay AMS.  5RR 39-40.

That decision was outside of the control of the Individuals, who, by that time, had

been "washed out" of A-Pro. Thus, the Individuals who had guaranteed against any

default by A-Pro on a particular purchase order in 2007 had no control how

Cornish or AMS allocated any payments that should have been credited against

amounts due under PO 1682 (if in fact they were not so credited).

**G. AMS realizes the Guaranty did not cover transactions under PO 1682 but names the Guarantors with other defendants anyway**

In 2009, Cornish informed Huston that AMS was aware it had made a mistake in connection with the PO that it had accepted; specifically, that AMS had accepted a PO from TQI and not A-Pro, and that it understood that the Guaranty did not apply to the purchase order it had accepted. 4RR 47. Nevertheless, in 2009, AMS sued Cornish, Draper, Hadley and Huston on the Guaranty, along with a variety of entities[5] for amounts it alleged to be due under the "contract", which it defined as Purchase Order 1682. CR 4-16.

**1. Trial evidence shows a zero balance was due under PO 1682**

While the documents on which AMS relied in asserting a sworn account claim showed invoices owed by A-Pro and TQI to AMS, none of the delinquent invoices arose from or referred to PO 1682 such that they would be covered by the Guaranty. *See* Supp. CR at 12-16 ("sworn account" attachment to the affidavit of AMS president Brad Scoggins, did not show any amounts aging pursuant to PO 1682). In fact, financial records for transactions concerning golf guru units subject to PO 1682 (whether the original PO 1682 or the one amended by Horne and Hurn), uniformly showed that a zero balance remained due on that purchase order, regardless of whether any amounts remained due under any other purchase orders for transactions between TQI and AMS. Robert Wallace, AMS's self-proclaimed

---

[5] These entities include A-Pro, Optinal LP Holdings, L.P., Optimal Intellectual Property, and TQI, CR 4-5, but AMS later nonsuited Optinal and Optimal, *see* 2RR 16.

11

"guy on accounting", 2RR 323, testified that, upon reviewing a spreadsheet he prepared addressing invoices on which AMS based its sworn account claim, amounts remained due on a variety of different invoices for different items, but the records "show[] a balance of zero" due under the one invoice that mattered for the Guaranty – PO 1682. 2RR 329; *see also* 6RR 908 (Ex. 81) (source record showing a zero balance for PO 1682); 6RR 909 (pivot table showing zero balance due under PO 1682). And the sworn account exhibit provided with AMS's original petition (offered as exhibit D to the affidavit of Brad Scoggins, Supp. CR at 12-16, and offered at trial as exhibit 94, 6RR 1045) similarly showed no amounts due under PO 1682. *See, e.g.*, 2RR 329. Moreover, AMS president, Brad Scoggins, in reviewing the invoices on which AMS based its claims conceded that PO 1682 did not appear to be an "aging" invoice on which AMS based its claims. Finally, Exhibit 141 offered at trial (a re-creation of exhibit 82) similarly showed that numerous amounts were due under other invoices between TQI and A-Pro and AMS, but it did not show any amounts due under PO 1682. 6RR 424-36. Thus, whatever the record may have shown to be due and owing as between TQI and A-Pro and AMS, the record did not show any amounts were due under PO 1682, the only purchase order subject to the Guaranty, and did not show any default by A-Pro on any such amounts that would trigger the Guaranty.

## 2. The trial court's judgment

During trial, Cornish conceded liability for amounts due by TQI and A-Pro to AMS and even conceded his personal liability for one-quarter of amounts due to AMS, while the Individuals took the position that any obligation under the Guaranty must be strictly construed. They argued that there could be no liability under the Guaranty beyond the strict terms of the Guaranty and for changes to the Guaranty to which the Individual Guarantors did not consent. After trial, the court:

> relied heavily on *McKnight v. Virginia Mirror Co., Inc.*, 464 S.W.2d 428, 430 (Tex. 1971)) and *Vastine v. Bank of Dallas*, 808 S.W.2d 463 (Tex.1991). Specifically, *McKnight* holds that 'a guarantor is entitled to have his agreement strictly construed and that it may not be extended by construction or implication beyond the precise terms of his contract' without the guarantor's consent. (emphasis added).

CR 88 (letter from trial court to parties regarding preliminary ruling).

That recognition notwithstanding, the trial then court rendered final judgment in favor of AMS and against A-Pro, TQI, and Cornish, and the Individuals. CR 435. As to TQI and A-Pro, it awarded judgment jointly and severally in the amount of $382,484.92 plus interest, along with judgment against them, jointly and severally for attorney's fees through trial and conditional appellate attorney's fees. *Id* 435-36. (By way of a judgment nunc pro tunc, the trial court reduced the amount of fees to $150,000, CR 493.). As to the Individuals, it rendered judgment against each for $70,408.47 plus interest and liability for attorney's fees. CR 425.

13

In response to a request from the Individuals, CR 440, the trial court entered findings of fact and conclusions of law, CR 443, but declined to enter modified findings and conclusion in response to their request, *see* CR 454, 485. The Individuals timely filed a notice of appeal, CR 505, but Cornish, TQI, and A-Pro did not appeal.

## SUMMARY OF ARGUMENT

The judgment against the Individual Guarantors should be reversed, as the evidence at trial demonstrates it is contrary to applicable law.

As the judgment against the Individual Guarantors arises from the Guaranty, the starting point must be the law governing guarantees. Texas law requires that guarantees be strictly construed, and a guarantor may not be held liable for any modifications of a guaranty made without the guarantor's consent. *See McKnight v. Virginia Mirror Co., Inc.*, 463 S.W.2d 428, 430 (Tex. 1971). Thus, whatever the record may establish as to the liability of A-Pro or TQI or Cornish to AMS on the basis of any <u>contractual</u> relationships, the judgment enforcing the <u>Guaranty</u> against the Individual Guarantors constitutes error because the judgment extends liability beyond the Guaranty's terms. A strict construction of the Guaranty reveals its obligations were not triggered for at least the following reasons.

First, while the Guaranty contemplated the extension of credit to "A-Pro" as an entity (the only entity with which the Individuals were affiliated), and in fact

14

expressly stated it was given in consideration for such credit,[6] the purchase order enforced by the judgment was <u>not</u> with A-Pro and was instead with the separate entity TQI, owned exclusively by Cornish.[7] A strict construction of the Guaranty, as required by Texas law, compels the conclusion that the transaction contemplated by the Guaranty – the extension of credit to A-Pro – never occurred, such that no obligation arose under the Guaranty to be enforced.

Second, assuming a transaction that would trigger any guaranteed obligation ever occurred, the terms of any such transaction were materially altered without the consent of the Individual Guarantors from what had been described in the Guaranty. Specifically, after the execution of the Guaranty, agreements were made that altered the price of the products subject to PO 1682, the quantity, and the date of delivery for such products, all without consultation or consent of the Individual Guarantors. Under Texas law, those alterations eliminated any obligations that may have otherwise existed under the Guaranty because they extended liability beyond the precise terms of the Guaranty.

Finally, even assuming an obligation arose under the Guaranty to secure all amounts due to AMS under PO 1682, the evidence in the record established no liability was triggered – the record failed to demonstrate the existence of any "default" on any "amounts due" under PO 1682 by A-Pro as "purchaser." First,

---

[6] 6RR 27-30.
[7] 6RR 25.

15

the record established that TQI – not A-Pro – was the "Purchaser" under PO 1682 such that the "purchaser" requirement of the Guaranty was not satisfied.  But more importantly, the record established that there was no default on obligations under PO 1682 by <u>anyone</u>.  Every exhibit offered by AMS showed a zero balance due in connection with PO 1682 (even while they showed amounts due under other purchase orders), such that the "default" on amounts due element was not satisfied either.  As any obligation undertaken by the Individuals must be constrained by the terms of the Guaranty, which narrowed any obligations to amounts due under PO 1682, the fact that nothing remained due under that PO (pursuant to AMS's own records) demonstrates that the judgment against the Individuals under the Guaranty constitutes error.

As to the award of attorney's fees, as the judgment against the Individuals must be reversed for the reasons noted above, so too must the award of attorney's fees.  But that award also must be reversed because AMS did not segregate among recoverable and non-recoverable fees, and fees incurred in connection with prosecuting and defending claims that did not concern the Individuals.

## ARGUMENTS AND AUTHORITIES

**I.     The judgment against the Individuals constitutes error given the terms of the Guaranty and the evidence in the record**

AMS's counsel was emphatic at trial in referring to the importance of Purchase Order 1682 to the case.  *See* 2RR 24 ("You'll get sick of that as this goes

16

on.  You'll hear a lot about Purchase Order 1682.")  And counsel certainly was correct about the importance of PO 1682.  But its importance arises from the fact that its terms demonstrate the error in the judgment below: (1) PO 1682 does not demonstrate a transaction between <u>A-Pro</u> and <u>AMS</u> as contemplated by the Guaranty that would amount to the extension of credit to A-Pro, but only one between TQI and AMS;  (2) any Guaranty referencing PO 1682 was materially altered in at least three respects (price, quantity, and Christmas season delivery dates) without the consent of the Individuals when PO 1682 was altered by Horne and Hurn, thus eliminating any obligations that could otherwise exist; and  (3) the evidence at trial established that PO 1682 carried with it a zero balance, leaving no amount in default to be enforced pursuant to the terms of the Guaranty, assuming A-Pro was the "Purchaser" who could default under that PO in any event.

A.     **Standard of review**

The Individuals challenge the legal sufficiency of the evidence supporting the liability findings.  More precisely, their points contend that (1) AMS presented no evidence on a point on which it bore the burden of proof, the absence of which was fatal to its claim, and/or (2) the evidence in the record conclusively establishes the opposite of a fact essential to AMS's prima facie case.  *See City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005).

To the extent AMS sought to enforce a Guaranty of PO 1682, it had the burden to establish the existence of a valid and enforceable Guaranty, that the material terms did not change or that if they did, then that any such change was made with the consent of the Individuals, and that amounts remained due under that PO that were guaranteed. As the Individuals' points either rely on an outright absence of evidence on an essential fact (*i.e.*, that a contract was entered between A-Pro and AMS, that AMS extended credit to A-Pro, or that any amounts remain due under PO 1682) or on a showing that evidence conclusively established facts contrary to those essential to AMS's case (*i.e.*, that any transaction that may have been guaranteed was materially altered without the consent of the Individuals) those issues are subject to a legal sufficiency standard of review.

## B.     The record demonstrates why the Individuals cannot be liable under the Guaranty

In announcing its ruling, the trial court correctly noted that the Individuals should be liable "only to the extent provided in the Guaranty and Purchase Order 1682." *See* CR 88-89. That ruling was consistent with the established legal principle that a guarantor is entitled to have the guaranty strictly construed, and cannot be liable for any modifications made without the guarantor's consent. *Id*. (citing *McKnight*, 463 S.W.2d at 430); *see also Pham v. Mongiello*, 58 S.W.3d 284, 288 (Tex. App. — Austin 2001, pet. denied) ("A guarantor's obligation will not be extended by implication beyond the precise written terms of the guaranty

contract."). But given the evidence offered at trial, and given the terms of the Guaranty and Purchase Order, the extent of the Individual Guarantor's liability should have been zero.

## 1. AMS failed to establish the existence of a transaction that would invoke the terms of the Guaranty

Nobody disputes that the Individuals executed the Guaranty. The issue, however, is whether the transaction contemplated by the Guaranty ever actually occurred such that the Guaranty would be enforceable in the first instance.

### a. AMS did not extend credit to A-Pro as contemplated by the Guaranty

By its own terms, the Guaranty was given in consideration for the extension of credit by AMS to A-Pro, of which each of the Individuals was a shareholder. *See* 2RR 27-30. The contemplated consideration constituted credit to be given to A-Pro, and the contemplated obligation to be guaranteed by A-Pro's shareholders given in exchange constituted all amounts due to AMS under Purchase Order 1682 for the purchase of 5000 Golf Guru units on which A-Pro (as "Purchaser") defaulted. *Id*.

It is undisputed that Purchase Order 1682 was not a contract between AMS and A-Pro (its terms so indicate), but instead was a contract between AMS and TQI Systems. 6RR 25. PO 1682 thus did not constitute any extension of credit to A-Pro; rather, if any credit had been extended in connection with PO 1682, it was extended to TQI, the sole named party on the PO. Indeed, Charles Huston drafted

19

a PO in A-Pro's name, *see* 6RR 423, but AMS would not use it and would not agree to extend credit to A-Pro.[8] As the transaction did not give rise to an extension of credit by AMS to A-Pro such that it could create a credit history, the Guaranty, when strictly construed, cannot be enforced against the Individuals because the consideration sought in connection with any guaranty was not given. *See Material Partnership v. Ventura*, 102 S.W.3d 252, 261 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (a guaranty cannot be binding without consideration).

### b. A-Pro was not a party to PO 1682

In the absence of a contract between AMS and A-Pro as referenced in the Guaranty, the Individuals cannot be held liable as guarantors of A-Pro because A-Pro was not subject to a contract on which it was liable. A guarantor's liability on a debt depends upon the liability of its principal. *See Moore v. White Motor Credit Corp.*, 708 S.W.2d 465, 472 (Tex. App.—Dallas 1985, writ ref'd n.r.e.). Thus, the obligation of the guarantor depends upon the obligation of the parties to any underlying contract. *Republic Nat'l Bank v. Northwest Nat'l Bank*, 578 S.W.2d 109, 114 (Tex. 1978). In the absence of any contract (PO 1682) between A-Pro and AMS, there is no underlying contract that would give rise to liability of the Individuals under the Guaranty because there are no contractual obligations owed

---

8 Whether AMS entered into separate purchases with A-Pro for other products and under other POs many months later, that fact does not extend the scope of the Guaranty drafted in light of the version of PO 1682 in effect in October 2007. *See Cox v. Lerman*, 949 S.W.2d 527, 530 (Tex. App. — Houston [14th Dist.] 1997, no writ) (an obligation will not extend beyond its precise terms).

by A-Pro under PO 1682 on which it could be in default. *See, e.g., OAIC Commercial Assets v. Stonegate Village,* 234 S.W.3d 726, 738 (Tex. App. — Dallas 2007, pet. denied) (standing to maintain breach of contract claim requires showing of third party beneficiary status or privity).

### c. AMS failed to establish an underlying breach of contract by A-Pro

The essential elements of a breach of contract claim require a showing (a) that there is a valid, enforceable contract; (b) the plaintiff is the proper party to sue for breach; (c) the plaintiff performed, tendered performance, or was excused from performing; (d) the defendant breached the contract; and (e) the breach caused injury to the plaintiff. *Mustang Pipeline Co. v. Drier Pipeline Co*., 134 S.W.3d 195, 200 (Tex. 2004). AMS's claims fail for want of evidence on at least several of these elements that are necessary prerequisites to a judgment holding the Individuals liable under the Guaranty.

There is a disconnect between the breach by A-Pro alleged by AMS and the scope of any Guaranty. The contractual claims AMS seeks to have guaranteed by the Individuals are not contracts identified in the Guaranty. A guaranty must (1) set forth the names of the parties involved, (2) reflect a manifestation of an intent to guaranty an obligation, and (3) describe the obligation to be guaranteed. *Hartford Fire Ins. Co. v. C Springs 300, Ltd.*, 287 S.W.3d 771, 778 (Tex. App.— Houston [1st Dist.] 2009, pet. denied); *Material Partnerships*, 201 S.W.3d at 261.

21

To enforce the Guaranty pursuant to its terms as strictly construed, AMS must establish not only (1) the existence of a valid and enforceable contract between it and A-Pro, but also (2) that such a contract is subject to the terms of the Guaranty. In other words, any valid and enforceable contracts between AMS and A-Pro are legally immaterial to a claim against Individuals as guarantors unless AMS shows that those contracts are subject to the Guaranty. In the absence of a contract between AMS and A-Pro for the purchase of goods under PO 1682, there can be no default for payments due by A-Pro as a purchaser, and thus, no amounts to be guaranteed.

As to the existence of a "contract" element, the record demonstrated A-Pro was not a party to the purchase order identified in the Guaranty, as noted above. And as to the "breach" element, the evidence offered by AMS established that any obligation breached by A-Pro (*i.e.*, PO 1007, 1019) were not subject to the Guaranty, a guaranty that only covered PO 1682.

No consideration supports a guaranty if neither the primary debtor (here A-Pro) nor the guarantor (here the Individuals) receive any benefit, and the primary creditor (here AMS) has not relinquished anything (here the extension of credit to A-Pro) or suffered any detriment (any default of payments owed by A-Pro as purchaser under PO 1682). *Fourticq v. Fireman's Fund Ins. Co.*, 679 S.W.2d 562,

22

564-65 (Tex. App.—Dallas 1984, no writ). Thus, there can be no claim against the Guarantors.

In short, the contract sued upon as the basis for the Guaranty never arose, leaving AMS without standing to asset liability against A-Pro for default of payment obligations under PO 1682, and depriving AMS of any claim against the Individuals as guarantors for such nonexistent obligations.

2. **Any obligations that could have ever existed under the Guaranty were eliminated by the multiple material alterations of any transaction described in the Guaranty**

If obligations arose under the Guaranty, then such obligations were eliminated by unauthorized alterations to the obligations that were the subject of the Guaranty. *McKnight*, 463 S.W.2d at 430. Under Texas law, if a contract subject to a surety is altered without the consent of the surety, the surety's obligation ceases, as the altered contract is no longer the contract of the surety. *United Concrete Pipe Corp. v. Spin-Line Co.*, 430 S.W.2d 360, 366 (Tex. 1968). Here, the record establishes at least three categories of material alterations made without the Individual Guarantor's consent: the change in the delivery date, the change in the quantity, and the change in the per-unit price. *See* 6RR 420; 6RR 968; 2RR 121.

The record establishes that changes to PO 1682 were made at the request of Rick Horne acting on Darryl Cornish's instructions, but that they were not made at

23

the request of any of the Individual Guarantors. Specifically, Iain Hurn testified that while the original PO 1682 had an expected delivery date of November 23, he discussed changing that date with Horne and perhaps Cornish, but that he had no discussions with any of the Individual Guarantors about the change. 2RR 220. Given the evidence that the terms of the transaction supposedly guaranteed were materially changed in multiple respects, and the absence of evidence establishing that the Individual Guarantors consented to the changes, any obligation under the Guaranty cannot extend beyond the precise terms of the contract, *i.e.*, to a guarantee of the purchase order as written when the Guaranty was signed. *See, e.g., Vastine v. Bank of Dallas*, 808 S.W.2d 463, 465 (Tex. 1991) (material alteration defense warranted reversal of a judgment against a guarantor). To the extent the judgment imposed liability beyond the Guaranty as originally written, it thus constitutes error.

Relying on self-serving testimony, AMS argued that the extension of the delivery deadline actually operated to the benefit of the individuals, but other testimony demonstrates why that conclusion is demonstrably incorrect. Testimony at trial established that had the units been delivered in time for the Christmas 2007 selling season, A-Pro would have been able to sell them all, which would have relieved the Individuals of any obligations and which would have provided a basis for A-Pro to earn credit. *See* 3 RR 69. Because the transaction as guaranteed was

24

altered without the consent of the Individuals, any liability under the Guaranty terminated.

**3.    The evidence established that no amounts were due under PO 1682.**

Finally, judgment against the Individuals under the Guaranty constitutes error because AMS's own evidence and witnesses confirm that no balance was due on PO 1682, and thus, no amount remained subject to the Guaranty, assuming a guaranty of default on amounts due under PO 1682 ever became effective. Whether amounts were due <u>under any other purchase orders</u>, the evidence at trial demonstrated that no amounts remained due <u>under the purchase order referenced by the Guaranty, PO 1682</u>.  That conclusion should have been fatal to any claim against the Individuals.

**a.    Testimony from AMS's own controller confirms what AMS's exhibits show – that nothing remained due under PO 1682**

Robert Wallace, AMS's controller and self-proclaimed "guy on accounting", 2RR 323, testified about amounts due under specific purchase orders.  He described Exhibit 81 as a "pivot table" he had generated from a spreadsheet that he had also prepared showing the balance due for each of the purchase order numbers listed.  2RR 324.  From that exhibit Wallace testified that balances were due in connection with certain purchase orders (for example, PO 1007, and 1019), but that

a balance of zero was due under the purchase order that was subject to the

Guaranty – PO 1682:

> Q. So that the next purchase order is 1682, right?
>
> A. Yes.
>
> Q. What's the quantity of 1682?
>
> A. 1,000.
>
> Q. And that matches the exhibit we look at 139, right?
>
> A. I believe so.
>
> Q. And that show a balance of zero, correct?
>
> A. It does show a balance of zero.

2RR 329-30; *see also* 6RR 908 (Exhibit 81) (The spreadsheet used to create Exhibit 81 was Exhibit 82 (6RR 909), and that exhibit also shows a balance of zero due under PO 1682.)  Exhibit 81 and 82, coupled with the testimony of AMS's accounting spokesperson, confirm that, as to the operative purchase order (the only one subject to the Guaranty), no amount was due, relieving the Individual Guarantors of any liability that ever could have attached to the transaction via the Guaranty of PO 1682.

### b. AMS's "sworn account" exhibits and testimony from other witnesses confirm that nothing remained due and owing under PO 1682

Similarly, during trial, AMS offered Exhibit 94 in support of its "sworn account" claim. 6RR 1045.  (Trial exhibit 94 was previously attached as Exhibit C

26

to AMS's Original Petition, Supp. CR 12, purporting to constitute the systematic record of "amounts due" supporting AMS's claim for a sworn account). That exhibit purported to show receivables with aging balances on which AMS asserted its claim, and the purchase orders with which those receivables corresponded. Notably, while Exhibit 94 identified various purchase orders under which amounts purportedly remained due to AMS from TQI or A-Pro, the exhibit did not show any amounts due under the one purchase order, PO 1682, referenced by the Guaranty on which AMS based its claims against the Individuals. *See* 6RR 1045-46 (Exhibit 94).

The disconnect between the amounts AMS claims to be owed by TQI and/or A-Pro and the amounts subject to the Guaranty traces back to AMS's original petition and to the accompanying affidavit of Brad Scoggins offered to support AMS's "sworn account" claim. Scoggins first noted that:

> AMS entered into Purchase Order 1682 with Assistant Pro, Inc. ('Assistant Pro') and TQI Corporation ('TQI') whereby Assistant Pro and TQI agreed to pay AMS for certain golf GPS navigation equipment and other materials, labor and services (the 'Contract')[9]. A systematic record has been kept of the Assistant Pro account and all amounts due and owing under the Contract.

Supp. CR 17, Orig. Pet., Ex. D, ¶ 2 (emphasis added). But the sleight of hand then comes when Scoggins identifies the "records" purportedly supporting AMS's

---

[9] Notably, this premise is demonstrably false as PO 1682 is only between AMS and TQI, does not name A-Pro, and does not otherwise reference a contract between AMS and A-Pro. 6RR 26.

sworn account claim. Scoggins does not refer to "records" showing amounts due under PO 1682, or even due "under the Contract". Instead, Scoggins references records showing amounts due under the "account of Assistant Pro and TQI." *Id*. ¶ 3 ("Attached to AMS's Original Petition as Exhibit C are certain business records from AMS reflecting the account of Assistant Pro and TQI.") (emphasis added); *see also id*. ¶ 5 ("The records within Exhibit C reflect Assistant Pro's account and show that Assistant Pro and TQI owe AMS $241,977.52") (emphasis added). Notably, that amount is totally detached from any reference to any amount due under PO 1682 (such that they would invoke the Guarantor) or "under the Contract" as a subpart of "Assistant Pro's account" generally. Moreover, the exhibits supporting Scoggins' affidavit confirm that, as to PO 1682, nothing was aging or due, as he testified at trial. Again, whether any amount was due AMS from TQI and/or A-Pro on their "account" misses the point and does not establish that any amounts remained due under PO 1682 and subject to any Guaranty.

Similarly, Iain Hurn testified that PO 1682 encompassed all of the business that A-Pro did with AMS regarding handheld GPS units, 2RR 212, including all color units built after AMS's September 2008 bid, 2RR 215. Thus, AMS's liability theory as to the Individuals extended beyond the terms of the Guaranty and covered all amounts due in relation to any transaction between AMS and either A-Pro or TQI, regardless whether incurred pursuant to PO 1682 or otherwise. Hurn

28

so testified, even recognizing that the Guaranty referenced PO 1682 and that PO 1682 referenced a specific part at issue that differed from the parts used in the color units. 2RR 219. When any obligations under the Guaranty are constrained to defaults on amounts due by A-Pro as the Purchaser under PO 1682, the error in the judgment below against the Individuals is apparent because the record shows no such defaults existed.

### c. The record confirmed that invoices particular to PO 1682 were not in fact aging so as to give rise to a claim under the Guaranty

Other AMS documents establish that no amounts were due and outstanding as to PO 1682. For example, trial exhibit 70, a compilation of invoices from AMS, failed to demonstrate that, as to PO 1682, anything remained due and outstanding. *See generally* 6RR 697-852. Exhibit 70 purported to include outstanding and aging invoices giving rise to AMS's claims. But none of the invoices included within the 155-page span of exhibit 70 that referenced PO 1682 appeared on AMS's list of aging receivables that gave rise to any of its claims. Indeed, Scoggins, testified about invoices concerning PO 1682 in exhibit 70:

Q.    And in other words, the invoices that specifically reference PO 1682 appear to have been paid?

A.    The POs references that show 1682 as the customer delivery PO on our invoices do not appear in the aging.

2RR 150.

29

To the extent that AMS did not even allege that the invoice on which it based its claims tied back to PO 1682, AMS's claims cannot purport to invoke the Guaranty as a basis for holding the Individuals liable under the Guaranty. As AMS's own evidence confirms, AMS did not sue on any aged obligation relating to PO 1682, and as the only guaranteed obligations relate to PO 1682, the Individuals were entitled to rendition of judgment in their behalf because AMS's claims did not implicate any guaranteed transactions.

### d. Every other exhibit cited by AMS in its motion for entry of judgment confirms that nothing remained due and owing under PO 1682

Other documentary evidence confirmed that the balance due under PO 1682 was zero, regardless whether TQI or A-Pro owed AMS on any other purchase orders or accounts. For further example, Exhibit 141, cited by AMS in its motion for entry of judgment, in fact made thirteen different references to amounts invoiced against PO 1682, but showed that all thirteen were paid and that no balance remained due on that PO. *See* 6RR 424 (Exhibit 141). Again, while the exhibit indicated amounts were due under other purchase orders, it also confirmed that nothing was due under the one PO referenced in the Guaranty.

In short, each exhibit referenced by AMS in its motion for entry of judgment that referenced "amounts due" against PO 1682, uniformly show that "zero" was due under PO 1682. *See* 6RR 908 (Exhibit 81); 6RR 909 (Exhibit 82); 6RR 1045

30

(Exhibit 94), 6RR 424 (Exhibit 141); 6RR 697 (Exhibit 70); see also 2 RR 329 (Wallace testifying PO 1682 shows a balance due of zero); 2RR 150 (Scoggins' testimony confirming PO 1682 is not an aging invoice). In the face of that evidence and testimony, the Individuals had no liability because they only agreed to guarantee defaults by A-Pro on amounts due under PO 1682. AMS's own evidence established that any liability arising under the Guaranty had been satisfied and nothing remained in default as to PO 1682. That record shows the absence of any liability on the part of the Individuals. Thus, the Individuals are entitled to a reversal of the judgment against them.

### e. AMS cannot classify the PO as a "blanket" PO in order to pigeonhole later obligations as arising under PO 1682 and thus subject to the Guaranty

AMS argued throughout trial that PO 1682 was something of a "blanket PO", or a manufacturer's service agreement, such that the obligations of PO 1682 persisted even though PO 1682 was never referenced in subsequent purchase orders, even when AMS's own "sworn account" spreadsheet showed no amounts were due under PO 1682, and even when AMS's records showed that the purchase orders sued upon were based on entirely different purchase orders, some with entirely different parties. *See* 6RR 1045 (Ex. 94) (basing liability on numbered POs, some naming TQI as purchaser and others naming A-Pro as purchaser, but

none referencing amounts due under PO 1682). Those arguments must be rejected for several reasons.

First, PO 1682 does not indicate that it is a blanket PO or manufacturer's service agreement. In fact, the bid on which PO 1682 is based expressly noted that, in the absence of a manufacturer's service agreement, reference to a particular purchase order would be necessary. *See* 6RR 668 (Ex. 42). AMS went forward without a manufacturer's service agreement, such that it cannot now claim that PO 1682 was a "blanket order.

Second, the record established that new purchase orders were entered starting in December 2008 – for the first time between AMS and A-Pro rather than TQI. *See* 6RR 688 (PO 1007). Notably, while AMS's liability spreadsheet shows no amounts due under PO 1682, it does show amounts due under this new PO and the ones that followed it, POs that issued more than a year after the Guaranty was signed. *See* 6RR 908. Thus, the fact that AMS invoiced matters based on particular purchase orders, but without reference to whether those orders were draw-downs of any particular "master" or "blanket" purchase order defeats ay implication that the Guaranty was intended to apply beyond its plain terms to govern other purchase orders as well. *See Cox*, 949 S.W.2d at 530. The "blanket PO" theory is thus a red herring that cannot be invoked to impose liability under the Guaranty where none otherwise exists.

**4. The Guaranty was limited to "amounts due" under PO 1682**

Under the operative language of the Guaranty, the Individuals agreed to guarantee "the payment of twenty five percent (25%) [of] <u>all amounts due</u> to Austin Manufacturing Services L.P. Inc, a Texas Limited Partnership, <u>under Purchase Order 1682</u> for the purchase of 5,000 Golf Guru units (hereinafter "Guaranteed Portion") on which A-Pro, as purchaser, defaulted. 6RR 27. Wallace's testimony, and Exhibits 81, 82, 94, 141, and 70 all confirmed that a zero balance remained due under Purchase Order 1682. Such evidence disposes of any liability under the Guaranty because it confirms that whatever may have been guaranteed ("all amounts due" under Purchase Order 1682) has been satisfied (zero remains due on Purchase Order 1682) assuming A-Pro was a "purchaser" as defined in the Guaranty in the first instance.

In describing the potential extent of the Individuals liability, the trial court ruled they were "liable under the Guaranty only to the extent provided in the Guaranty and Purchase Order 1682. <u>Specifically, the individual guarantors each guaranteed 25% of the purchase price of 5,000 black and white GPS Golf Guru units at a unit price of $128.95.</u>" *See* CR 89 (emphasis added). But that description about the extent of potential liability departs from the Guaranty's terms.

33

By the Guaranty, the individuals <u>did not</u> guarantee 25% of the <u>purchase price</u> of 5,000 black and white GPS Golf Guru units at a price of $128.95 (or at any price). Instead, they guaranteed 25% of "<u>all amounts due</u>" to AMS under PO 1682 on which the <u>Purchaser</u> (defined as "A-Pro") <u>defaulted</u> for the purchase of 5,000 Golf Guru units. The distinction is issue-dispositive.

Absent a showing of "amounts due" under PO 1682 on which A-Pro, as purchaser, defaulted, there can be no liability under the Guaranty. The Guarantors did not purport to guarantee that AMS would receive any certain purchase price for any certain number of units and they did not guarantee every obligation as between AMS and A-Pro and TQI. A contrary interpretation of the Guaranty would offend the rules requiring guarantees be strictly construed in favor of the guarantor and not extended by construction or implication. *See McKnight*, 463 S.W.2d at 430.

In sum, given the evidence and given testimony from AMS's controller that zero was due under the guaranteed PO 1682, there is no basis to hold the Individuals liable for any amounts under the Guaranty. The trial court's ruling to the contrary thus constitutes error and must be reversed.

## C.     The award of attorney's fees constitutes error

The trial court's award of attorney's fees in favor of AMS constitutes error. The award is erroneous because AMS did not segregate among recoverable and

34

non-recoverable fees or in light of with which defendant particular fees were incurred.

There is no question that AMS should have been obligated to segregate its fees and allocate among tasks for which fees may be awarded and those for which fees may not be awarded. First, because AMS spent thousands of dollars pursuing fraud and alter-ego claims, tasks that are not recoverable under chapter 38 of the Civil Practice and Remedies Code or pursuant to the terms of the Guaranty, AMS should have been obligated to segregate those fees out from those that might be recovered. *See Tony Gullo Motors v. Chapa*, 212 S.W.3d 299, 314 (Tex. 2007) ("no question" that fees incurred pursuing fraud claims were not recoverable). AMS sued two defendants who it later nonsuited, filed a quantum meruit claim, and undertook numerous other tasks that fell outside of the realm of a chapter 38 award of attorney's fees or an award pursuant to any contractual provision.

Not only should allocation among recoverable and non-recoverable tasks have been required, allocation among tasks attributable to the <u>various defendants</u> should have also been required. For example, to the extent AMS incurred fees in developing and proving a liability case against TQI, it makes no sense to hold the Individuals jointly and severally liable for those fees. In the absence of such allocation, the award holds the Individuals liable not only for fees that are not otherwise recoverable under chapter 38 of the Civil Practice and Remedies Code

35

against anyone, but also holds them liable for unrecoverable fees attributable to the conduct of other parties over whose litigation strategy they had no control (*i.e.*, the award holds the Individuals liable for AMS's fees incurred in responding to TQI/Cornish's summary judgment pleadings).  Thus, the Individuals pray that this Court, at a minimum, vacate the award of attorney's fees.

## PRAYER FOR RELIEF

Wherefore, premises considered, the Individuals respectfully pray that this Court reverse the judgment of the trial court and render judgment that AMS take nothing by its claims against them, retaining the judgment in favor of AMS as to Assistant Pro, Inc., TQI Corporation, and Darryl Cornish, and affirming the award of attorney's fess assessed against those defendants in a manner this Court deems appropriate.  Alternatively, the Individuals pray that this Court reverse the judgment of the trial court and vacate the award of attorney's fees in AMS's favor. The Individuals additionally pray for any additional relief to which it may be entitled.

Respectfully submitted,

*/s/ Michael S. Truesdale*
Michael S. Truesdale

LAW OFFICE OF MICHAEL S. TRUESDALE, PLLC
State Bar No. 00791825
801 West Avenue, Suite 201
Austin, TX 78701
512-482-8671
866-847-8719 (fax)
mike@truesdalelaw.com
Counsel for Dennis Draper, Greg Hadley and Charles
Huston

## CERTIFICATE OF SERVICE

On September 30, 2015, the undersigned certifies that he served a copy of this Brief of Appellants on the following via e-service, in compliance with Texas Rules of Appellate Procedure 9.5 and 25.1(e):

Brian A. Colao
bcolao@dykema.com
Christopher Kratovil
ckratovil@dykema.com
Dykema Gossett PLLC
1717 Main Street, Suite 4000
Dallas, Texas 75201

Counsel for Austin Manufacturing
Services

Shane M. Boasberg
shaneb@law-smb.com
The Law Offices of Shane M.
Boasberg, P.C.
2901 Bee Caves Road,
Commissioner's House, Box E
Austin, Texas 78746

Counsel for Assistant Pro, Inc., TQI
Corporation, and Darryl Cornish

*/s/ Michael S. Truesdale*
Michael S. Truesdale
SBN 00791825

37

# CERTIFICATE OF COMPLIANCE

The undersigned certifies that this brief complies with the word limitation contained in Texas Rule of Appellate Procedure 9.4(i)(2)(E) in that the brief contains a total of 8,928 words, excluding parts of the brief exempted by Tex. R. App. P. 9.4(i)(1), as calculated by the word count tool of Microsoft Word (2008) for Mac.

*/s/ Michael S. Truesdale*
Michael S. Truesdale

**APPENDIX**

Tab 1          Final Judgment (CR 492)

Tab 2          Findings of Fact and Conclusions of Law (CR 443)

Tab 3          Additional Findings of Fact and Conclusions of Law (CR 484)

1

# Tab 1

Filed in The District Court
of Travis County, Texas

JUL - 6 2015

At _____ //.'4/&_____ ____M.
Velva L. Price, District Clerk

CAUSE NO. D-1-GN-09-004416

| | | |
|---|---|---|
| AUSTIN MANUFACTURING SERVICES I, INC., | § § § | IN THE DISTRICT COURT |
| **Plaintiffs,** | § § § | |
| v. | § § | |
| ASSISTANT PRO INC, OPTIMAL LP HOLDINGS, I.P., OPTIMAL INTELLECTUAL PROPERTY, INC., TQI CORPORATION, DARRYL CORNISH, DENNIS DRAPER, GREG HADLEY, and CHARLES HUSTON, | § § § § § § § § | 353rd JUDICIAL DISTRICT |
| **Defendants.** | § § | **TRAVIS COUNTY, TEXAS** |

## FINAL JUDGMENT

The Court hereby renders Final Judgment in favor of Plaintiff Austin Manufacturing

Services I, Inc. ("Plaintiff" or "AMS"). Trial in this case occurred on April 14-16 and concluded

on April 30, 2014 before the Honorable Judge Orlinda L. Naranjo on breach of contract and

other claims asserted by Plaintiff against Defendants Assistant Pro Inc., ("A-Pro") TQI

Corporation ("TQI"), Darryl Cornish ("Cornish"), Dennis Draper ("Draper"), Greg Hadley

("Hadley"), and Charles Huston ("Huston") (Cornish, Draper, Hadley and Huston are

collectively referred to herein as the "Guarantors") (A-Pro, TQI, and the Guarantors are further

collectively referred to herein as the "Defendants").[1] Plaintiff and Defendants each appeared in

person and through their respective attorneys of record and announced ready for trial. The Court

determined it had jurisdiction over the subject matter and Parties to this proceeding.

---

[1] Defendants Draper, Hadley, Huston and A-Pro also asserted cross-claims against Defendant TQI and Cornish. Optimal IP Holdings, LP and Optimal Intellectual Property, Inc. were non-suited by Plaintiff prior to the time of trial.



004104352



On September 24, 2014, the Court found and held that Defendants A-Pro and TQI failed to make proper payment to Plaintiff under Purchase Order 1682; the Court further found and held that the Guarantors failed to make proper payment under their Guaranties of Purchase Order 1682. As a result, this Court finds and holds, that Defendants are validly justly indebted to Plaintiff and also that Plaintiff is entitled to recover its attorneys' fees and costs under both Texas law and the terms of the Guaranties at issue in this case.

On April 16, 2015 the Court entered its Final Judgment in this case. On June 5, 2015 Plaintiff moved for Judgment Nunc Pro Tunc to correct two clerical errors in the original April 16, 2015 Final Judgment. The errors corrected by this Judgment are the name of Plaintiff Austin Manufacturing Services I, Inc. originally described as Austin Manufacturing Services, Inc. and the amount of the attorneys' fees award against each Defendant, which was incorrectly listed at $196,961.55 for all Defendants but Defendant Huston. The correct sum of attorneys' fees awarded to Plaintiff is $150,000.00, assessed jointly and severally against all Defendants and the correct name of the Plaintiff in this case is Austin Manufacturing Services I, Inc. This Final Judgment does not modify in any substantive way the Court's prior Judgment and merely corrects these two clerical errors.

Consistent with the Court's rulings, findings and interlocutory holdings (all of which are incorporated into this Final Judgment for all purposes), the Court renders Final Judgment on all claims asserted by and between all Parties in the above-referenced proceeding as follows:

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED** that the Court enters judgment in favor of Plaintiff AMS against Defendants A-Pro, TQI, Cornish, Draper, Hadley and Huston; Plaintiff AMS is the prevailing party in all respects and is entitled to FINAL JUDGMENT on its claims for breach of contract and/or guaranty.

**FINAL JUDGMENT – Page 2 of 6**

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that AMS has prevailed on its claim for breach of contract against Defendants TQI and A-Pro. AMS shall have Final Judgment against and shall recover from TQI and A-Pro, jointly and severally, the amount of $382,484.92 for goods and services provided by AMS, plus 5% pre-judgment interest from December 29, 2009 through November 14, 2014 of $93,315.84, plus $52.40 per day until this Final Judgment is entered. The total judgment against A-Pro and TQI for breach of contract is $475,800.76, plus $52.40 per day. This total sum shall bear post-judgment interest at 5% per annum, compounding annually, from the date of entry of this Final Judgment until such judgment is fully satisfied. AMS shall also have Final Judgment against Defendants TQI and A-Pro, jointly and severally with all Defendants, for its attorneys' fees and costs in the amount of $150,000.00 through the submission of judgment, with conditional fees of $25,000.00 if the matter is appealed to the Austin Court of Appeals, and another $20,000.00 of conditional fees if a further appeal is taken to the Texas Supreme Court.

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that AMS has prevailed on its claim for breach of guaranty against Defendant Cornish. AMS shall have Final Judgment against Cornish for goods and services guaranteed by Cornish in the amount of $85,621.23, plus 5% pre-judgment interest from December 29, 2009 through November 14, 2014 of $20,889.23 plus $11.73 per day until this Final Judgment is entered. The total judgment against Cornish for breach of guaranty is $106,510.45, plus $11.73 per day. This total sum shall bear post-judgment interest at 5% per annum, compounding annually, from the date of entry of this Final Judgment until such judgment is fully satisfied. AMS shall also have Final Judgment against Defendant Cornish, jointly and severally with all Defendants, for its attorneys' fees and costs in the amount of $150,000.00 through the submission of judgment, with conditional fees of $25,000.00 if the

matter is appealed to the Austin Court of Appeals, and another $20,000.00 of conditional fees if a further appeal is taken to the Texas Supreme Court.

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that AMS has prevailed on its claim for breach of guaranty against Defendant Draper. AMS shall have Final Judgment against Draper for goods and services guaranteed by Draper in the amount of $70,408.47, plus 5% pre-judgment interest from December 29, 2009 through November 14, 2014 of $17,177.74, plus $9.64 per day until Judgment is entered. The total judgment against Draper for breach of guaranty is $87,586.21, plus $9.64 per day. This total sum shall bear post-judgment interest at 5% per annum, compounding annually, from the date of entry of this Final Judgment until such judgment is fully satisfied. AMS shall also have Final Judgment against Defendant Draper, jointly and severally with all Defendants, for its attorneys' fees and costs in the amount of $150,000.00 through the submission of judgment, with conditional fees of $25,000.00 if the matter is appealed to the Austin Court of Appeals, and another $20,000.00 of conditional fees if a further appeal is taken to the Texas Supreme Court.

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that AMS has prevailed on its claim for breach of guaranty against Defendant Hadley. AMS shall have Final Judgment against Hadley for goods and services guaranteed by Hadley in the amount of $70,408.47, plus 5% pre-judgment interest from December 29, 2009 through November 14, 2014 of $17,177.74, plus $9.64 per day until Judgment is entered. The total judgment against Hadley for breach of guaranty is $87,586.21, plus $9.64 per day. This total sum shall bear post-judgment interest at 5% per annum, compounding annually, from the date of entry of this Final Judgment until such judgment is fully satisfied. AMS shall also have Final Judgment against Defendant Hadley, jointly and severally with all Defendants, for its attorneys' fees and costs in the amount of

**FINAL JUDGMENT – Page 4 of 6**

$150,000.00 through the submission of judgment, with conditional fees of $25,000.00 if the matter is appealed to the Austin Court of Appeals, and another $20,000.00 of conditional fees if a further appeal is taken to the Texas Supreme Court.

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that AMS has prevailed on its claim for breach of guaranty against Defendant Huston. AMS shall have Final Judgment against Huston for goods and services guaranteed by Huston in the amount of $70,408.47, plus 5% pre-judgment interest from December 29, 2009 through November 14, 2014 of $17,177.74, plus $9.64 per day until Judgment is entered. The total judgment against Huston for breach of guaranty is $87,586.21, plus $9.64 per day. This total sum shall bear post-judgment interest at 5% per annum, compounding annually, from the date of entry of this Final Judgment until such judgment is fully satisfied. AMS shall also have Final Judgment against Defendant Huston, jointly and severally with all Defendants, for its attorneys' fees and costs in the amount of $150,000.00 through the submission of judgment, with conditional fees of $25,000.00 if the matter is appealed to the Austin Court of Appeals, and another $20,000.00 of conditional fees if a further appeal is taken to the Texas Supreme Court.

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED** that Plaintiff AMS is the prevailing party for all purposes and is therefore entitled to recover its costs of court from the Defendants, who are jointly and severally responsible for the payment of all Plaintiffs' recoverable costs of court.

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that all writs and processes for the enforcement and collection of this FINAL JUDGMENT may issue as necessary.

496

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that this judgment finally disposes of all Parties and all claims and is appealable. This is a FINAL JUDGMENT. All relief not specifically granted herein is expressly DENIED.

Signed this ___6___ day of ~~June~~ July, 2014.

_____
THE HONORABLE ORLINDA NARANJO

APPROVED AS TO FORM ONLY:

_____
Michael S. Truesdale
Counsel for Dennis Draper, Greg Hadley, and Charles Huston

**FINAL JUDGMENT – Page 6 of 6**

# Tab 2

D-1-GN-09-004416

| | | |
|---|---|---|
| AUSTIN MANUFACTURING SERVICES, INC., AMS, LP, and AMS ACQUISITION CORP., | § § § § | IN THE DISTRICT COURT |
| Plaintiffs, | § § | |
| v. | § § | 353rd JUDICIAL DISTRICT |
| ASSISTANT PRO INC, OPTINAL LP HOLDINGS, L.P., OPTIMAL INTELLECTUAL PROPERTY, INC., TQI CORPORATION, DARRYL CORNISH, DENNIS DRAPER, GREG HADLEY, and CHARLES HUSTON, | § § § § § § § § | |
| Defendants. | § | TRAVIS COUNTY, TEXAS |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

The Court entered Final Judgment in favor of Plaintiff Austin Manufacturing Service ("Plaintiff" or "AMS") on April 16, 2015, consistent with this Court's September 26, 2014 letter ruling, against Defendants Assistant Pro, Inc. ("A-Pro"), TQI Corporation ("TQI"), Darryl Cornish ("Cornish"), Dennis Draper ("Draper"), Greg Hadley ("Hadley") and Charles Huston ("Huston" and collectively with Cornish, Draper and Hadley the "Guarantors;" A-Pro, TQI and the Guarantors are further collectively referred to herein as the "Defendants") following a bench trial conducted on April 14-16 and 30th of 2014. On May 4, 2015, Defendants Draper, Hadley and Huston requested Findings of Fact and Conclusions of Law.

This Court makes the following findings of fact and conclusions of law. To the extent that any finding of fact made by this Court should properly be considered a conclusion of law, and to the extent that any conclusion of law made by this Court should properly be considered a finding of fact, it is the express intent of the Court that any statement identified herein as a



004041550



finding of fact also be deemed a conclusion of law and any statement identified herein as a conclusion of law shall also be deemed a finding of fact.

After considering the case file, the pleadings, the evidence presented at trial, the testimony of the parties, and the argument and briefs of counsel, the Court finds that the following findings of fact and conclusions of law are supported by a preponderance of the evidence, and are consistent with its Final Judgment of April 16, 2015:

## I.

## FINDINGS OF FACT

1. Defendants Dennis Draper ("Draper"), Darryl Cornish ("Cornish"), Greg Hadley ("Hadley") and Charles Huston ("Huston" and collectively with Cornish, Draper and Hadley, the "Guarantors") were the owners and principals of Defendant Assistant Pro, Inc. ("A-Pro") and/or Defendant TQI Corporation ("TQI").

2. A-Pro and TQI (hereinafter "A-Pro/TQI") are sister companies doing business in Travis County, Texas. The Guarantors were authorized to act on behalf of A-Pro and conducted business and operations on its behalf. Defendant Cornish was authorized to act on behalf of TQI and conducted business and operations on its behalf.

3. A-Pro and TQI shared common management including specifically but not limited to Defendant Cornish and employee Richard Horne ("Horne"), office space and other resources, were affiliated companies in all respects, and interacted with Plaintiff AMS Manufacturing Services, Inc. ("AMS" or "Plaintiff") as a single and/or joint unit. Cornish and Horne were authorized to act on behalf of both A-Pro and TQI, and they did so in their dealings with AMS.

4. A-Pro developed and sold "Golf Guru" units, portable GPS units designed to assist golfers during their rounds of golf. A-Pro/TQI contracted with AMS, an Austin, Texas based

manufacturing company, to manufacture these Golf Guru units. Defendants A-Pro/TQI entered into a contract with AMS on behalf of A-Pro to purchase 5,000 black and white Golf Guru units priced at $128.95 each on October 9, 2007. This contractual order was reflected and memorialized in Purchase Order 1682 ("PO 1682"), a true and correct copy of which is attached hereto as **Exhibit 1**. A-Pro/TQI assumed responsibility for any and all materials and or/all units manufactured by AMS pursuant to or under PO 1682. As such, A-Pro/TQI are jointly responsible for and obliged to AMS under PO 1682.

5. On October 19, 2007, the Guarantors each individually signed and personally guaranteed (the "Guarantees") 25% of PO 1682 (the "Guaranteed Portion"). The Guarantees expressly included 25% of the order of 5,000 black and white Golf Guru units at $128.95 per unit, referred to as the "Guaranteed Portion" under the Guarantees.

6. The Guarantors waived and abandoned notice of acceptance of guaranty, demands and notices of nonpayment, and consented to any extensions of time for payment of the Guarantees.

7. The Guarantors contractually agreed to pay any attorneys' fees and costs incurred by AMS in collecting under the Guarantees and/or under PO 1682.

8. AMS manufactured the Golf Guru units for A-Pro/TQI which, in turn, were guaranteed by the Guarantors who were the principals and owners of A-Pro and/or TQI.

9. A-Pro/TQI took and accepted delivery of several thousand Golf Guru units manufactured pursuant to PO 1682. A-Pro/TQI took and accepted delivery from AMS of models with both color screens and black and white screens. AMS delivered all the Gulf Guru units and fully satisfied all of its obligations to A-Pro/TQI.

10. A-Pro/TQI sold the Golf Guru units manufactured and received from AMS and received payment from third parties for those units sold. The Guarantors acknowledged that the

Golf Guru units were received and accepted by A-Pro/TQI; that they were aware of such receipt and that, following such receipt the Golf Guru units were sold by A-Pro/TQI without remitting payment to AMS.

11. A-Pro/TQI failed to pay in full for the goods delivered to them by AMS. Specifically, A-Pro/TQI failed to pay AMS in full for the Golf Guru units ordered under PO 1682.

12. A-Pro/TQI's outstanding balance due to AMS, excluding any interest and fees, for purchases under PO 1682 (and excluding all other amounts owed to AMS) is comprised of: (1) accounts receivable of $241,977.52; (2) work in progress of $51,873.06; (3) raw materials in the amount of $42,379.58; and (4) finished goods in the amount of $6,254.76. Thus, the total amount due to AMS under PO 1682 (and excluding all other amounts owed to AMS by A-Pro/TQI) was $342,484.92.

13. The total amount past due and owing to AMS by A-Pro and TQI, excluding fees and interest, for all purchases made by A-Pro/TQI was $382,484.92. This amount reflects all partial payments made to AMS by A-Pro/TQI as well as any lawful offsets and credits and represents the total amount due and owing under PO 1682.

14. The application of all payments and/or credits to the balance owed on PO 1682 was done either at the express instruction of one or more of the Defendants, with their authorization, and/or where no instruction was given, consistent with industry practice and with notification to Defendants of the application and an opportunity to object to same. Defendants did not object to the application of any payment.

15. The total amount due to AMS by A-Pro/TQI can be segregated into black and white and color Golf Guru units. The total amount due to AMS for black and white Gulf Guru units (*i.e.*, excluding any color screen units) under PO 1682 was $300,892.08 after the application of

all payments, lawful offsets, and credits (excluding any interest and fees); the remaining amount due and owing is attributable to color Golf Guru units. The black and white Golf Guru units balance is comprised of the following amounts: (1) $230,432.62 in receivables; (2) $21,825.12 for work in progress; (3) $42,379.58 in raw materials; and (4) $6,254.76 in finished goods. The black and white Golf Guru units have a unique number allowing AMS to properly identify and segregate the amounts due and owing on black and white versus color Golf Guru units.

16. The application of all payments and/or credits applied to black and white Golf Guru units and also any color Golf Guru units was done either at the express instruction of one or more of the Defendants, with their authorization, and/or where no instruction was given, consistent with industry practice and with notification to Defendants of the application and an opportunity to object to same. Defendants did not object to the application of any payment.

17. Defendant and Guarantor Cornish, an officer for both corporations, specifically admitted and acknowledged that A-Pro/TQI were liable to AMS in the amount of $382,484.92.

18. Defendant Cornish unequivocally approved and consented to individually and personally guarantee the purchase of both color and black and white Golf Guru units from AMS by A-Pro under PO 1682. However, the terms of the other Guarantors' Guarantees remained the same at 5,000 black and white Golf Guru units at $128.95. The fundamental terms of PO 1682 never changed. Any decisions made by Cornish or Horne or any additional orders or modifications of PO 1682 materially benefitted both Cornish and his fellow Guarantors as A-Pro accepted and materially benefitted from the sale of both color and black and white Golf Guru units.

19. Defendant Cornish consented to and accepted all changes to PO 1682. As a result, the amount owed by Defendant Cornish under his individual Guaranty to AMS, was $85,621.23, exclusive of attorneys' fees and interest, which represents 25% (twenty five percent) of the total

amount still due and owed to AMS under PO 1682. Defendant Cornish expressly admitted and acknowledged his liability in this amount.

20. Defendants Draper, Hadley and Huston each individually guaranteed 25% (twenty five percent) of the purchase of 5,000 black and white (as distinct from color) Golf Guru units from AMS at the price of $128.95 per unit. Defendants Draper, Hadley and Huston did not guarantee the purchase of any color Golf Guru units from AMS.

21. AMS' recovery from Defendants Draper, Hadley and Huston is limited to black and white units ($300,892.08) at a unit price of $128.95. After applying a unit price of $128.95, the accounts receivable balance is reduced to $211,368.54 and the finished goods balance is $6,060.65. The amounts owed for WIP ($21,825.12) cannot be further reduced as they are not reflected at a final sales or unit price, but rather at their extended value which is a lower amount. Similarly, the amounts owed for raw materials ($42,379.58) need not be further reduced as they are billed at cost (there is no mark-up on the amount) which is lower than a unit or sales price.

22. The amount due and owing to Plaintiff is $281,633.89. Defendants Draper, Huston, and Hadley each guaranteed twenty-five percent of that amount which made them each liable for $70,408.47.

23. Accordingly, the portion of PO 1682 guaranteed by Defendants Draper, Hadley and Huston was $70,408.47 each, exclusive of attorneys' fees and interest, or 25% (twenty five percent) of the total amount due to AMS under PO 1682 at the price of $128.95 per black and white Golf Guru unit.

24. A-Pro/TQI defaulted on their obligations to AMS, including specifically on their obligations under PO 1682; AMS fully performed under PO 1682 but has not been fully paid for the Golf Guru units it delivered to A-Pro/TQI. A-Pro/TQI have failed to pay for the Gulf Guru units ordered and delivered under PO 1682.

25. The Guarantors defaulted on their obligations to AMS under PO 1682 and the Guarantees; the Guarantors have not paid AMS the amounts they guaranteed and that A-Pro/TQI failed to pay to AMS under PO 1682. Each Guarantor has breached his Guaranty to AMS.

26. A-Pro/TQI and the Guarantors each failed to pay their due-and-owing obligations to AMS despite multiple demands made by AMS to them to do so.

27. Plaintiff AMS was compelled to retain and pay for the services of legal counsel in order to obtain payment from the Defendants. Plaintiff AMS incurred $196,961.55 in attorneys' fees during the prosecution of this lawsuit, including trial. The Court determined after hearing the evidence and testimony by counsel that $46,961.55 were required to be segregated and represented non-recoverable fees. The Court found the remaining fees, in the amount of $150,00.00, to be reasonable and necessary to the prosecution of AMS' lawsuit, properly segregated, to bear a reasonable relationship to the amount in controversy, and that the award of these fees is just and proper.

28. Further segregation of attorneys' fees is unnecessary and/or not possible in this case, as Plaintiff has established that the time expended upon all the discrete legal services performed in this case for which fees have been awarded advanced both the recoverable and unrecoverable claims asserted by Plaintiff, or necessarily rebutted affirmative defenses asserted by the Defendants. *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 313 (Tex. 2006); *Stewart Title Guar. Co. v. Aiello*, 941 S.W.2d 68, 73 (Tex. 1997). All of the claims and affirmative defenses asserted in this case arise from a common nucleus of operative fact. The Court concludes that the recoverable and unrecoverable claims asserted by Plaintiff, as well as the rebuttal of affirmative defenses asserted by the Defendants, were all deeply and inherently intertwined and thus not subject to further or additional segregation under Texas law. *Id.*

29. Plaintiff initiated this lawsuit against the Defendants to obtain payment on December 29, 2009.

30. This Court held a bench trial on April 14-16 and April 30, 2014 on Plaintiff's claims.

31. On April 16, 2015, the Court entered Final Judgment in favor of Plaintiff and against all Defendants. This Final Judgment is based upon and consistent with the letter ruling of September 26, 2014 in favor of Plaintiff.

32. On May 4, 2015, Defendants Hadley, Huston and Draper requested findings of fact and conclusions of law.

33. Any of the foregoing Findings of Fact that should more properly be considered a Conclusion of Law is so deemed, and should be treated as such.

## II.

## CONCLUSIONS OF LAW

1. All Defendants are subject to personal jurisdiction in Texas.

2. This Court has subject matter jurisdiction over this matter.

3. AMS is a party to all contracts between itself, TQI, A-Pro and the Guarantors and is the proper party to bring any suit under any such contract or purchase order, including expressly PO 1682 and the Guarantees.

4. The Guarantees are enforceable, valid contracts between the Guarantors and AMS.

5. Purchase Order 1682 (PO 1682) is an enforceable, valid contract between AMS, TQI and A-Pro. *Id.* PO 1682 may be enforced by AMS against TQI and A-Pro.

6. AMS fully performed all of its obligations to A-Pro, TQI and the Guarantors, including expressly the manufacture and delivery of Golf Guru units, fulfilling any and all conditions precedent to the performance of Defendants.

7. A-Pro/TQI failed to perform their obligations to AMS by failing to remit payment in full for all the Golf Guru units manufactured and delivered by AMS. This failure to perform constituted a material breach of A-Pro's and TQI's obligations to AMS.

8. A-Pro/TQI failed to perform their material obligations to AMS by failing to remit payment in full for all the Golf Guru units manufactured and delivered by AMS under PO 1682. This failure to perform constituted a material breach of A-Pro/TQI's obligations to AMS under PO 1682.

9. The Guarantors failed to perform their material obligations to AMS by failing to remit—despite proper demand from AMS—payment in the amount of the Guaranteed Portion for 25% of the manufactured black and white Golf Guru units manufactured and delivered by AMS under PO 1682. This failure to perform constituted a material breach of the Guarantors' obligations to AMS under their respective Guarantees.

10. Defendant and Guarantor Cornish consented to and accepted any and all changes in his individual Guarantee.

11. No material alteration of Defendants Hadley, Huston or Draper's respective Guarantees occurred because no material changes to the terms of their Guarantee encompassing PO 1682 occurred, and, if such change had occurred, because any such material changes would have been beneficial to the respective Guarantors. *Austin Hardwoods Inc. v. Vanden Berghe*, 917 S.W.2d 320, 325 (Tex. App.—El Paso 1995, writ denied). The Guarantors other than Cornish further materially benefitted from all decisions made by either Cornish or Horne with respect to PO 1682. As a result, Draper, Hadley and Huston remained liable under the Guarantees for 5,000 black and white Golf Guru units at $128.95 per unit. The Guarantors were never discharged or released from their obligations under their Guarantees.

---

**Findings of Fact and Conclusions of Law**     **Page 9**

12. The Guarantees obligated Defendants Hadley, Huston and Draper to each pay 25% of the purchase price of 5,000 black and white Golf Guru units at $128.95 per unit, but the Guarantors have failed to make these required payments to AMS.

13. The Guarantees obligated Cornish to pay back 25% of A-Pro/TQI's total liability under PO 1682, but Cornish has failed to pay the required payments to AMS.

14. The Guarantors contractually agreed to pay Plaintiff's attorneys' fees incurred in any attempt to collect under PO 1682 or the Guarantees. In addition to this contractual basis for recovery of fees, all Defendants are also liable for Plaintiff's attorneys' fees under Chapter 38 of the Texas Civil Practice & Remedies Code.

15. The Court awards reasonable and necessary attorneys' fees in the amount of $150,000.00 to Plaintiff AMS. The conditional attorneys' fees of $25,000 in the event of an appeal to the Austin Court of Appeals and $20,000 in the event of an appeal to the Texas Supreme Court are also reasonable and necessary.

16. All Defendants are jointly and severally liable for Plaintiff's attorneys' fees.

17. Plaintiff AMS is the prevailing party in this case for all purposes and as the prevailing party, Plaintiff is entitled to recover its costs of court.

18. Plaintiff is entitled to pre-judgment interest on all amounts recovered from Defendants through April 16, 2015 at 5%.

19. Plaintiff is entitled to post-judgment interest on all amounts recovered from Defendants beginning on April 16, 2015 at 5% interest, compounding annually until the judgment is fully satisfied.

---

20. Any of the foregoing Conclusions of Law that should more properly be considered a Finding of Fact is so deemed, and should be treated as such.

ENTERED ON: May 21, 2015

JUDGE PRESIDING

---

# Tab 3

CAUSE NO. D-1-GN-09-004416

| | | |
|---|---|---|
| AUSTIN MANUFACTURING<br>SERVICES I, INC., | § <br> § <br> § | IN THE DISTRICT COURT |
| Plaintiff, | § <br> § | |
| v. | § <br> § | |
| | § | 353rd JUDICIAL DISTRICT |
| ASSISTANT PRO INC, OPTINAL LP<br>HOLDINGS, L.P., OPTIMAL<br>INTELLECTUAL PROPERTY, INC.,<br>TQI CORPORATION, DARRYL<br>CORNISH, DENNIS DRAPER, GREG<br>HADLEY, and CHARLES HUSTON, | § <br> § <br> § <br> § <br> § <br> § | |
| Defendants. | § <br> § <br> § | TRAVIS COUNTY, TEXAS |

## ADDITIONAL FINDINGS OF
## FACT AND CONCLUSIONS OF LAW

The Court entered Final Judgment in favor of Plaintiff Austin Manufacturing Service I, Inc. ("Plaintiff" or "AMS") on April 16, 2015, consistent with this Court's September 26, 2014 letter ruling, against Defendants Assistant Pro, Inc. ("A-Pro"), TQI Corporation ("TQI"), Darryl Cornish ("Cornish"), Dennis Draper ("Draper"), Greg Hadley ("Hadley") and Charles Huston ("Huston" and collectively with Cornish, Draper and Hadley the "Guarantors;" A-Pro, TQI and the Guarantors are further collectively referred to herein as the "Defendants") following a bench trial conducted on April 14-16 and 30th of 2014. On May 4, 2015, Defendants Draper, Hadley and Huston requested Findings of Fact and Conclusions of Law. Plaintiff filed its Proposed Findings of Fact and Conclusions of Law on May 18, 2015. The Court entered its Findings of Fact and Conclusions of law on May 21, 2015. Defendants Draper, Hadley and Huston requested additional findings of fact and conclusions of law on May 27, 2015. After considering the pleadings, the evidence presented at trial, and the arguments and briefs of counsel, the Court


004062633



484

makes the following additional findings of fact in support of and consistent with its Final Judgment of April 16, 2015:

## I.

## FINDINGS OF FACT

1.     Austin Manufacturing Services, L.P., ("AMS LP") a partnership, was a predecessor entity to Austin Manufacturing Services I, Inc.  AMS LP merged into Austin Manufacturing Services I, Inc., whose Chief Executive Officer at the time of trial was Brad Scoggins.  Any and all obligations, debts, accounts receivables, contracts or other debts or instruments belonging to AMS LP or any other "Austin Manufacturing Services" entity now belong in their entirety to Austin Manufacturing Services I, Inc., including but not limited to AMS LP's interest in any Guarantees executed by any of the Defendants in this case or its contractual relationships with any of the Defendants in this case. Austin Manufacturing Services I, Inc. was the Plaintiff and prevailing party in this case.

2.     The Court's Finding of Fact No. 4 entered on May 21, 2015 referred to a copy of PO 1682 which was not attached as "Exhibit 1" as specified.  The Court hereby attaches PO 1682 as "Exhibit 1" in reference to Finding of Fact No. 4.

3.     The Final Judgment is in favor of Plaintiff Austin Manufacturing Services I, Inc. in its capacity as Plaintiff and sole prevailing party under the Final Judgment.


ENTERED ON: _Jure 5, 2015_

_Judge Orland B_____

_____
JUDGE PRESIDING

485

# EXHIBIT
# 1

TQI Systems, LTD

9008 Anderson Mill Rd
Austin, TX 78729
Phone #     512-401-8103
Fax #       512-250-5020

# Purchase Order

| Date | P.O. No. |
|------|----------|
| 10/9/2007 | 1682 |

| Vendor | Ship To |
|--------|---------|
| AMS<br>Po Box 671161<br>Dallas, TX 75267-1161<br><br>Vendor Contact:   Steve Bandy<br>Vendor Phone:   512-651-5327<br>Vendor Fax: | TQI Systems<br>TQI Systems, LTD<br>9008 Anderson Mill Rd<br>Austin, TX 78729 |

| Quote # | | Terms | Expected | Ship Via |
|---------|---|-------|----------|----------|
| 9/24/2007 | | Net 60 | 11/23/2007 | |

| TQI P/N | Vendor P/N | MPN | Description | Qty | U/M | Cost | Deliver On | Extension |
|---------|-----------|-----|-------------|-----|-----|------|-----------|-----------|
| TC21301 | | TC21301 | GPS Golf Guru Assembly | 5,000 | ea | 128.95 | | 644750.00 |
| Tooling Ch.. | | | PCB Tooling | | | 1,000.00 | | 1,000.00 |
| | | | NOTE:<br>To be shipped direct to<br>customer from AMS | | | | | |

Approved By:_____

**Total**          $645,750.00

IMPORTANT! Please confirm receipt of PO, along with pricing and delivery by  email to
jsmith@tqicorp.com, or fax to 512-250-5020

AMS SUPP000322                                                    AMS SUPP000322

487

**ORLINDA NARANJO**
**Judge**
(512) 854-4023

**TAMMY ST.GEORGE**
Court Operations Officer
(512) 854-4023



## 419TH DISTRICT COURT

HEMAN MARION SWEATT TRAVIS COUNTY COURTHOUSE
P. O. BOX 1748
AUSTIN, TEXAS 78767
FAX: (512) 854-2224

**TRENT HIGHTOWER**
Staff Attorney
(512) 854-4029

**DORA CANIZALES**
Official Court Reporter
(512) 854-9329

**STEPHANIE WILLIAMS**
Court Clerk
(512) 854-5854

June 8, 2015

*Via Facsimile (214) 462-6401*
Brian Colao
Dykema Gossett PLLC
Attorneys for Plaintiff
1717 Main Street, Suite 4000
Dallas, Texas 75201

*Via Facsimile (512) 476-1228*
Brian O'Toole
Attorney for Defendants Dennis Draper, Greg
Hadley, and Charles Huston
O'Toole Atwell, PC
504 Lavaca, Suite 945
Austin, Texas 78701

**Via Facsimile (512) 561-5004**
Shane Boasberg
Attorney for Defendant Darryl Cornish
The law Offices of Shane M. Boasberg, PC
2901 Bee Caves Road, Suite E
Austin, Texas 78746

**Re:     Cause No. D-1-GN-09-004416; Austin Manufacturing Services Inc. vs. Assistant Pro Inc,. et al, ; In the 353rd. Judicial District Court, Travis County, Texas**

Dear Counsel:

Enclosed is the signed Additional Findings of Fact and Conclusions of Law in the above-referenced matter. The Order has been stamped and filed with the District Clerk's Office.

If you have any questions regarding this matter, please contact me directly at (512) 854-4023.

Sincerely,

Tammy St. George
Court Operations Officer to Judge Orlinda L. Naranjo
419th District Court, Travis County

Enclosures (1)
xc:  Ms. Velva Price, District Clerk

488



# 419TH DISTRICT COURT

HEMAN MARION SWEATT TRAVIS COUNTY COURTHOUSE
P.O. BOX 1748

**ORLINDA L. NARANJO**
Judge
(512) 854-4023

AUSTIN, TEXAS 78767

FAX: (512) 854-2224

**DORA CANIZALES**
Official Court Reporter
(512) 854-9329

**TAMMY ST.GEORGE**
Court Operations Officer
(512) 854-4023

**TRENT HIGHTOWER**
Staff Attorney
(512) 854-4029

## FAX COVER SHEET

Date: __6/8/15__

To: **Brian Colao**
**Brian O'Toole**
**Shane Boasberg**

Fax No.: *(214) 462-6401*
**(512) 476-1228**
**(512) 561-5004**

From: Tammy St. George, Court Operations Officer to Judge Orlinda Naranjo

Fax No.: **512-854-2224**

Message: **Signed Order from Judge Naranjo's 419th. Civil District Court**

Number of Pages: *6 Including Fax Cover)*

If there is a problem with the transmission of this facsimile, please me at 512-854-4023.

\*\*\*\*\*\*\*\*\* -2222 458 215     - \*\*\*\*\* -     DC H1614- \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

-419TH DISTRICT COURT     -

| 00:02:15 | 006 | 8125615004 | ☎ | OK | 001 |
| DURATION | PAGES | STATION NAME/TEL NO. | ABBR NO. ONE-TOUCH/ | COMM. | STN NO. |

FILE NO.=434

MODE = MEMORY TRANSMISSION     START=JUN-08 11:39     END=JUN-08 11:42

\*\*\*\*\*\*\*\* -COMM. JOURNAL- \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\* DATE JUN-08-2015 \*\*\*\*\* TIME 11:42 \*\*\*\*\*\*\*\*\*\*\*



# 419TH DISTRICT COURT

### HEMAN MARION SWEATT TRAVIS COUNTY COURTHOUSE
P.O. BOX 1748

**ORLINDA L. NARANJO**
Judge
(512) 854-4023

AUSTIN, TEXAS 78767

FAX: (512) 854-2224

**DORA CANIZALES**
Official Court Reporter
(512) 854-9329

**TAMMY ST.GEORGE**
Court Operations Officer
(512) 854-4023

**TRENT HIGHTOWER**
Staff Attorney
(512) 854-4029

## <u>FAX COVER SHEET</u>

**Date:** <u>6/8/15</u>

**To:** <u>**Brian Colao**</u>
<u>**Brian O'Toole**</u>
<u>**Shane Boasberg**</u>

**Fax No.:** <u>*(214) 462-6401*</u>
<u>**(512) 476-1228**</u>
<u>**(512) 561-5004**</u>

**From:** <u>Tammy St. George, Court Operations Officer to Judge Orlinda Naranjo</u>

**Fax No.: 512-854-2224**

**Message:** **Signed Order from Judge Naranjo's 419th. Civil District Court**

**Number of Pages:** *6 Including Fax Cover)*

       **If there is a problem with the transmission of this facsimile, please me at 512-854-4023.**

\*\*\*\*\*\*\*\*\* -4222 458 215    - \*\*\*\* -    DC HT914- \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

    - TRUOD TCIRTSID HT914-

| NO. STN | COMM. | ONE-TOUCH/ ABBR NO. | STATION NAME/TEL NO. | PAGES | DURATION |
|---|---|---|---|---|---|
| 001 | OK | ☎ | 85124761228 | 006 | 00:01:12 |

FILE NO.=432

MODE = MEMORY TRANSMISSION    START=JUN-08 11:14    END=JUN-08 11:15

\*\*\*\*\*\*\*\*\*\*\* -COMM. JOURNAL- \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\* DATE JUN-08-2015 \*\*\*\*\* TIME 11:15 \*\*\*\*\*\*\*\*\*